**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**


| | | |
|---|---|---|
| **BRAD NELTON** | * | **CIVIL ACTION** |
| | * | |
| **VERSUS** | * | **NO. 10-373** |
| | * | |
| **CENAC TOWING CO., LLC** | * | **SECTION "L" (1)** |


<u>**FINDINGS OF FACT AND CONCLUSIONS OF LAW**</u>

**I. BACKGROUND AND PROCEDURAL HISTORY**

This case arises out of injuries that Brad Nelton allegedly sustained on March 22, 2009. On that day, Mr. Nelton was employed as a seaman by Cenac Towing Co., LLC (hereinafter "Cenac"), and he worked onboard the M/V MARIE CENAC, which is owned and operated by Cenac. Mr. Nelton avers in his Complaint that in the course of performing his employment duties, he attempted to remove a nut that was fastened to a header valve and that he did so using a double-wrenching technique. Mr. Nelton alleges that as a result, he sustained severe injuries.

In February 2010, Mr. Nelton filed suit in this Court against Cenac, asserting claims under the Jones Act, 46 U.S.C. § 30104, and under general maritime law. In his Complaint, Mr. Nelton asserts that Cenac was negligent in its failure to adequately supervise and train the crew and in its instructions and orders to its employees and that this negligence caused his injuries. Mr. Nelton also alleges that the vessel was unseaworthy, and he asserts his right to maintenance and cure. To the extent that Cenac willfully failed to satisfy its maintenance and cure obligations, Mr. Nelton also seeks punitive damages and attorney's fees.

In its answer, Cenac denies liability. Cenac avers that it was not negligent and that any

1

injury Mr. Nelton sustained was caused by his own negligence. Cenac also asserts that the vessel was seaworthy and that it has satisfied its maintenance and cure obligations. Cenac has also asserted a counterclaim against Mr. Nelton. Cenac seeks to recover maintenance and cure payments that it avers have been unnecessary because Mr. Nelton's injuries were caused by a prior car accident. Mr. Nelton has denied liability with respect to that counterclaim.

This case was tried without a jury starting on November 15, 2010. The trial lasted three days. The Court has carefully considered the testimony of all of the witnesses, the exhibits entered into evidence during the trial, as well as the record. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court hereby enters the following findings of fact and conclusions of law.[1] To the extent that any findings of fact may be construed as conclusions of law, the Court hereby adopts them as such. To the extent that any conclusions of law constitute findings of fact, the Court adopts them as such.

## II. FINDINGS OF FACT

1.     Mr. Nelton was born on March 10, 1976. The highest level of formal education he has attained is a ninth-grade education. Since his first experience working on a boat at the age of 7, when he went shrimping with several relatives, Mr. Nelton has had experience working on vessels. Mr. Nelton worked as a deckhand for several years prior to joining Cenac.

2.     Mr. Nelton filed a job application with Cenac in January 2004, seeking employment as a deckhand. Mr. Nelton indicated on his application that he did not have "any physical . . .

---

[1] At trial, the Court reserved ruling on whether the argument raised by Cenac that Mr. Nelton has forfeited his right to maintenance and cure in light of *McCorpen v. Cent. Gulf S.S. Corp.*, 396 F.2d 547 (5th Cir. 1968), fails as a matter of law. That issue is addressed herein.

condition(s) which [might] interfere with or hinder" his job performance. He also checked the box "yes" in response to the question "If injured, will you accept the medical facilities recommended by your employer?" In February 2004, Mr. Nelton went to the Houma Family Practice Clinic for a pre-employment physical examination, as well as a respiratory fit test, which is undertaken to ensure that a protective mask fits properly on the individual's face. The physician found that Mr. Nelton had no injury to his neck at that time and that he was fit for regular duty. Mr. Nelton was also able to complete the head and neck exercises as part of the respirator fit test.

3.      Mr. Nelton began employment as a deckhand with Cenac in February 2004. The primary responsibility of such a deckhand is to assist the tankerman, his superior, in performing the tankerman's duties, including preparing a barge for loading and discharge. In May 2005, Mr. Nelton obtained a tankerman's license from the United States Coast Guard and was promoted to tankerman at Cenac. Mr. Nelton worked in that capacity for about a year. He lost his tankerman's license following a positive drug test. Thereafter, Cenac continued to employ Mr. Nelton as a deckhand.

4.      On April 26, 2008, Mr. Nelton was in a car accident. Mr. Nelton was in the backseat of a car along with family members when it was rear-ended. An ambulance was dispatched to the scene. The record of Acadian Ambulance Service, which transported Mr. Nelton from the site of the accident to the hospital, shows that Mr. Nelton reported "no pain or tenderness [in his neck] upon palpation or movement." A hard cervical collar was placed on him as a matter of precaution. Dr. Randall Lillich, the emergency room physician who examined Mr. Nelton after the accident, had the collar removed and found that Mr.

Nelton had no pain or injury to his neck or shoulders. The neck was not tender, and it had a painless range of motion. Dr. Lillich found that Mr. Nelton had only mild pain in his lower back, and he did not order an MRI of Mr. Nelton's neck.

5.      On May 27, 2008, Mr. Nelton went to the Houma Family Practice Clinic for an annual physical examination and for a respirator fit test. Mr. Nelton had no trouble completing head and neck exercises as part of the respirator fit test. During the physical, Mr. Nelton told Dr. Michael Watkins that he had "no new problems." Dr. Watkins did not otherwise find that Mr. Nelton had neck or shoulder pain or numbness or tingling in his fingers. At trial, Dr. Watkins testified that had Mr. Nelton had an obliterated nerve root at C6-C7 in his cervical spine at that point, he would have expected to find neck and shoulder pain, as well as numbness or tingling in Mr. Nelton's fingers.

6.      Based on the physical, Dr. Watkins found Mr. Nelton fit for regular duty. At trial, Dr. Watkins testified that he would have liked to have known about the April 26, 2008 car accident. He also testified, however, that had he had the findings of Dr. Lillich before him and had he known that Dr. Lillich did not order an MRI, he would have reached the same decision and cleared Mr. Nelton for regular duty. There is no imaging study taken before March 22, 2009 or other medical evidence showing that Mr. Nelton sustained a neck injury as a result of the car accident on April 26, 2008. There is no evidence that the car accident otherwise predisposed Mr. Nelton to a neck injury.

7.      Mr. Nelton's former spouse, Susan Leblanc, testified that after the accident, Mr. Nelton complained about his neck and that she urged him to see a doctor. Her testimony and demeanor revealed bias, which raised credibility issues. Mr. Eddie Authement, a

4

coworker of Mr. Nelton at all relevant times, also testified that Mr. Nelton complained about his shoulder. The credible evidence, however, is that following that car accident, Mr. Nelton did not have neck or shoulder pain as a result of the accident. His other coworkers and supervisors – Mr. Danny Hunter, Mr. Sean Romero, and Mr. Milburn Noel – all testified that Mr. Nelton did not complain about neck or shoulder pain or numbness in his fingers to his coworkers or supervisors prior to his injury in March of 2009 and that, other than one time when Mr. Nelton hurt his left wrist, he was capable of performing his work duties. Mr. Nelton gave the same testimony at trial, and Kay Nelton, Mr. Nelton's current spouse, also testified that at the time, Mr. Nelton had no problems with his neck, shoulder, and arms.

8.    An individual who works as a deckhand or a tankerman "must have the ability to move extremities and spine through full physiological range of motion" in order to "work in a variety of postures." Such an individual must "frequently use one and two hands through the work period" and "perfom[] activities involving the fingers." An individual must also be able to lift "at least 65 lbs. from floor to shoulder level on a daily basis" and "at least 80 lbs. from floor to waist on level on a daily basis." Such an individual must also be able to "lift and carry at least 80 lbs. with two hands at waist level for a minimum distance of 20 ft. on a level surface." The fact that after April 26, 2008, and with the exception of the period during which he hurt his wrist, Mr. Nelton was able to meet these physical demands supports the conclusion that Mr. Nelton did not sustain an injury to his neck as a result of the April 26, 2008 car accident.

9.    At the time of his injury giving rise to the instant case, Mr. Nelton was attempting to

remove a nut on a header valve by means of a double wrenching procedure. The term "double wrenching" refers to two different techniques of removing nuts and bolts. The first consists of using one box end wrench on a nut and putting a second wrench on the other side in order hold the nut and prevent it from spinning. The second form of double wrenching consists of attaching one end of a wrench to the end of another in order to, in effect, make a single and substantially longer wrench. This technique may be referred to as the interlocking double-wrenching technique, and it was the form of double wrenching that Mr. Nelton used at the time of his injury.

10.    Both Mr. Jack Madeley, the expert called by Mr. Nelton, and Mr. Norman Dufour, the expert called by Cenac, testified that the interlocking double-wrenching technique is an unsafe way of removing a nut. The technique is dangerous because it presents several types of risks. First, a wrench is not designed to be used in that manner, and as a result, the technique can lead to tool breakage. Second, the two wrenches may unexpectedly slide on one another while the individual is applying force, causing the individual to lose his footing. Third, an individual who uses this type of double-wrenching technique can over-exert himself if the wrenches either slip or are not of sufficient length. By increasing the pressure in the spinal column, the exertion of force from the upper extremities can cause a disc in the cervical spine to herniate. The use of the muscles attached from the shoulder blade to the cervical spine can also give rise to a mechanical injury. Cenac, through its corporate representative Mr. Andrew Soudelier, acknowledges that this technique is dangerous and should not be used.

11.    There are safer alternatives that can be used to remove a nut that is too tight. First, an

individual can use liquid wrench. This product is most commonly used when the nuts have become rusty. Liquid wrench penetrates the rust and helps to lubricate the surface. Second, an individual can use a breaker bar. Third, to the extent that the bolts are of requisite size, an individual can use a hammer wrench that is nonsparking. Fourth, an individual can also use an air wrench, again, to the extent that the bolts are of requisite size.

12.    There is no evidence that Cenac taught its employees to use these alternatives or that it made them readily available for employees. Instead, the evidence shows that Cenac employees frequently used the interlocking double wrenching technique, making it an accepted practice on Cenac's vessels. In March 2009, Mr. Romero, Mr. Hunter, Mr. Noel, and Mr. Authement were, respectively, the captain, the relief captain, the pilot, and a tankerman of the M/V MARIE CENAC. At trial, all four testified that they consider the interlocking double wrenching technique to be an appropriate and accepted method by which to remove nuts and bolts.

13.    In February 2004, before he assumed duties on vessels, Mr. Nelton attended a training and orientation program conducted by Cenac called Deckhand School. As part of that pre-employment training, Mr. Nelton reviewed Cenac's Safety Manual and Procedure Handbook. The handbook provides specific instructions on a number of tasks that employees are required to perform, such as how to lasso a timberhead. The handbook does not contain suggestions or instructions regarding the removal of nuts, a task that employees frequently perform.

14.    As part of his pre-employment training in February 2004, Mr. Nelton also reviewed

Cenac's Responsible Carrier Program manual. Section B.2 of the manual lists a number of safety rules to which employees must adhere. In particular, Rule 29 states to employees: "[d]o not use a tool that is inappropriate for the job." Beyond this general directive, the manual does not otherwise instruct employees how to remove a nut that is too tight or warn them against using the interlocking double-wrenching technique.

15.     As part of the Deckhand School, Mr. Nelton was shown how to perform various tasks on videos and on a simulator barge. There is no evidence that these demonstrations concerned the removal of nuts and bolts. While on the job, however, Mr. Nelton was taught by other crew members to use the interlocking double-wrenching technique. Mr. Nelton found that the technique was used under every captain for whom he worked and on every vessel to which he was assigned. Mr. Nelton learned that the interlocking double-wrenching technique is one to which he is to resort readily if he finds that a nut is too tight.

16.     Cenac's Safety Handbook instructs employees to report "all" injuries "immediately." Similarly, the Responsible Carrier Program manual tells employees to report "all injuries . . . regardless of how slight" they are. At the same time, however, at crew change meetings prior to the incident, Cenac told its employees about its concern that there were too many reports of minor injuries and that it was financially costly to take crew members on and off the vessels. In particular, at the crew change meeting prior to Mr. Nelton going onboard the M/V MARIE CENAC, Cenac told employees that if they get hurt, they should avoid getting off the vessel and instead try to "stick it out."

17.     On March 22, 2009, Mr. Nelton was onboard the M/V MARIE CENAC, along with Mr.

8

Eddie Authement, a tankerman and Mr. Nelton's superior. Also onboard were Mr. Hunter, the relief captain, and Mr. Noel, the pilot. Mr. Authement asked Mr. Nelton to help him remove the nuts and bolts on a header blind in preparation for loading the barge. The best position from which to remove the nuts and bolts of the blind that is at issue is to stand inside the drip pan that surrounds the blind. Mr. Authement testified that according to his present recollection, he was standing outside of the drip pan at the time. The credible evidence, however, is that Mr. Authement was standing inside the drip pan.

18.     There is room for only one person to stand in the drip pan at any one time. As a result, Mr. Nelton stood outside the drip pan. Mr. Nelton could have chosen to wait for Mr. Authement to step out of the drip pan. He testified, however, that Cenac employees are expected to work as a team. In other words, Mr. Nelton understood that he was to work alongside Mr. Authement to remove the nuts. Accordingly, Mr. Nelton stood outside of the drip pan in order to assist Mr. Authement completing a task that could have been done by one person. Mr. Authement's instruction to Mr. Nelton heightened the risk that Mr. Nelton would over-exert himself. The injury at issue could have been avoided had Mr. Authement not asked Mr. Nelton to assist him while he himself was standing in the drip pan.[2]

19.     There were eight nuts and bolts on the blind at issue, and Mr. Nelton and Mr. Authement were to remove four each. Mr. Nelton had a bucket of tools with him. The bucket

---

[2] During the cross-examination of Mr. Nelton at trial, Cenac was also able to draw from Mr. Nelton the acknowledgment that the incident was not caused by "anything that [his] fellow crew members did or failed to do." In light of the other evidence presented in this case, the Court declines to accord any weight to this isolated statement.

included wrenches and extra nuts and bolts. There was no liquid wrench in the bucket, but Mr. Nelton could have gone to the vessel to retrieve that product. He found one of the nuts too tight. At first, he tried the first form of double wrenching by putting a second wrench on the back side of the blind. That did not help to remove the nut.

20.     Mr. Nelton then tried to use the interlocking double wrenching technique. As Mr. Nelton applied force on the interlocked wrenches, he heard a pop in his lower neck. Mr. Nelton asked Mr. Authement if he had heard anything. Although Mr. Authement testified that he may have seen Mr. Nelton using the first form of double wrenching when he heard the popping sound and when Mr. Nelton asked him whether he had heard anything, the credible evidence is that Mr. Nelton used the interlocking double-wrenching technique at that moment.

21.     After he heard the popping sound, Mr. Nelton stopped removing the nuts and bolts. Although Mr. Authement testified that Mr. Nelton continued to work on the header blind, the credible evidence is to the contrary. Afterward, Mr. Nelton told Mr. Noel, the pilot, about the pop in his neck. Mr. Noel suggested that he raise the issue with Mr. Hunter, the relief captain. The following day, March 23, 2009, Mr. Nelton felt worse and spoke to Mr. Hunter. Mr. Hunter saw that Mr. Nelton was moving in an unusual way and had a crick in his neck. The two agreed not to fill out an accident report in light of the discussion at the crew change meeting regarding the costs of injuries. Mr. Nelton thought that it was a pulled muscle at the time, and he limited himself to performing light duties thereafter.

22.     On March 24, 2009, Mr. Romero replaced Mr. Hunter, who relayed what he saw to Mr.

10

Romero. Mr. Nelton also spoke to Mr. Romero, telling him that he had hurt his neck and that he had agreed with Mr. Hunter not to fill out an accident report. Mr. Nelton left the M/V MARIE CENAC on March 31, 2009 and went home to Oklahoma.

23.   On April 1, 2009, Mr. Nelton went to see Dr. Scott Dycus, his family doctor. Dr. Dycus referred Mr. Nelton to Vantage Open MRI for an MRI. The MRI, taken on April 10, 2009, reveals a left-sided disc herniation at C6-C7 in Mr. Nelton's cervical spine that pressed on the left nerve root at C7. By pressing on the nerve root, such a disc herniation can cause pain in the neck, the left shoulder, and the left arm, as well as numbness or loss of sensation in the fingers of the left hand.

24.   On April 17, 2009, Mr. Nelton went to see Dr. Jeffrey Nees, a neurosurgeon. Dr. Nees reviewed the MRI and performed a physical examination of Mr. Nelton. He found moderate parasinous spasms and a mild limitation in the range of motions in the neck of Mr. Nelton. Dr. Nees also found decreased left triceps reflex and decreased left C7 sensation. Mr. Nelton told Dr. Nees that he had suffered the symptoms since the March 22, 2009 incident. The diagnosis of Dr. Nees is that Mr. Nelton had "radiculopathy secondary to disc herniation in the neck." The term "radiculopathy" refers to a compression of the nerve root at the spinal level. Dr. Nees found that the herniation "appears to be fresh and due to his work-related injury." He found that the herniation was unrelated to the April 26, 2008 car accident. After having reviewed the medical records of Dr. Lillich, Dr. Nees reached the same conclusion at his deposition. Dr. Nees recommended that Mr. Nelton receive epidural steroid injections as a temporary measure to relieve the pain.

25.   Cenac requested that Mr. Nelton see a doctor in Louisiana. Mr. Nelton acquiesced and

thus did not go back to Dr. Nees. On May 18, 2009, Mr. Nelton went to see Dr. Mark

Boquet at the Houma Family Practice Clinic. Dr. Boquet also diagnosed Mr. Nelton with

"cervical radiculopathy C7-left." In his report dated May 19, 2009, Dr. Boquet found that

the work incident, described by Mr. Nelton at the time as "trying to loosen bolts on a

header blind using 2 wrenches facing down," is "the only cause of the patients' [sic]

condition." Dr. Boquet referred Mr. Nelton to Dr. Christopher Cenac, Jr.

26.   On May 25, 2009, about two months after the incident, Mr. Nelton went to see Dr. Cenac

at the Houma Orthopedic Clinic. Dr. Cenac reviewed the April 10, 2009 MRI and

performed a physical examination. In his report, Dr. Cenac stated that Mr. Nelton has a

left-sided herniation at C6-C7 and "left upper extremity radiculopathy." Dr. Cenac also

wrote that these conditions are "related to him being injured on the boat." Dr. Cenac gave

a prescription for muscle relaxers, pain medications, anti-inflammatories, and neurogenic

medications. At a follow up visit on July 6, 2009, Dr. Cenac prescribed physical therapy

in order to reduce the symptoms. At trial, Dr. Cenac declined to state that the March 22,

2009 incident played no role in causing Mr. Nelton's neck injury.

27.   Mr. Nelton saw Debora Horsch for physical therapy starting on July 10, 2009 and ending

on September 19, 2009. Mr. Nelton achieved significant improvements in terms of

reducing pain and enhancing the range of motion during the course of that therapy. As

the medical doctors who testified in this case noted, however, the therapy did not correct

the underlying anatomical problem -- namely, the disc herniation. The disc protrusion

remained in place and rendered Mr. Nelton vulnerable to injury. Ms. Horsch

12

recommended that Mr. Nelton be discharged "unless [there is] further order by the physician." Ms. Horsch thought that it was possible that Mr. Nelton might be re-ordered to undergo physical therapy.

28.     On September 21, 2009, Mr. Nelton had a follow-up visit with Dr. Cenac. At trial, Dr. Cenac testified that in his opinion, Mr. Nelton was "basically" at maximum medical improvement on that date. He explained that Mr. Nelton's "cervical issues seemed to have resolved." In his office notes from that visit, however, Dr. Cenac wrote that in comparison to the previous visit on July 6, 2009, he found that there was "no change in [the] cervical exam" and that Mr. Nelton "continues to be symptomatic," albeit "mainly in his shoulder." Dr. Cenac contemplated that Mr. Nelton "may" be released "if" he is "doing well" at a follow-up visit six weeks thereafter. The credible evidence is that Mr. Nelton did not reach maximum medical improvement on September 21, 2009, although he was on track to be released in early November.

29.     On September 29, 2009, Mr. Nelton was in a car accident. A vehicle backed into Mr. Nelton's car at a speed of about 15 miles per hour. Mr. Nelton went to see Dr. Dycus, who referred him to Ms. Horsch for physical therapy starting on October 14, 2009. The records of Ms. Horsch show that Mr. Nelton had seven visits, the last of which occurred on October 30, 2009. At the last visit, Mr. Nelton was 70 to 80 percent better; he had a higher level of pain and a more limited range of motion in comparison to when he was discharged on September 19, 2009. Mr. Nelton declined to continue physical therapy because he could not afford the sessions. Cenac's cure payment ledger shows that Cenac did not pay for any of the physical therapy sessions following the September 29, 2009

13

accident.

30.     At the direction of Dr. Dycus, Mr. Nelton had an MRI on November 4, 2009 at

Brookhaven Diagnostic Imaging Center in Oklahoma. When compared to the MRI taken

on April 10, 2009, this second MRI reveals no progression with respect to the disc

herniation at C6-C7. The radiologist wrote that the findings at C6-C7 "are similar to

those seen on the previous exam." Although the radiologist also noted a tear at C6-C7,

none of the medical doctors who testified at trial attributed significance to that finding.

At trial, Dr. Zoran Cupic testified that the findings are essentially the same and that the

accident caused a flare-up of his previous symptoms. Dr. Angel Roman testified that the

tear is a minor finding that is of little significance and that what is worth noting is that the

disc protrusion remained.

31.     On direct examination, Dr. Cenac indicated that there was a difference at the C6-C7 level

between the two MRIs and that the September 29, 2009 car accident "possibly could

have progressed the disease." But on cross-examination, Dr. Cenac stated that the first

MRI had shown a "complete obliteration" of the neural foraminal and that he was not

sure whether it could get worse than that. Dr. Cenac testified that the findings of the two

MRIs are "about the same." As such, the credible evidence is that the September 29,

2009 car accident caused a flare up of Mr. Nelton's condition and that it did not yield a

medically significant change in Mr. Nelton's cervical spine at C6-C7.

32.     In late 2009, Mr. Nelton asked Cenac to allow him to see Dr. Nees or another doctor in

Oklahoma, near his residence. Cenac refused to do so, advising Mr. Nelton that it would

terminate his wage continuation if he does not travel to Louisiana to see Dr. Cenac. In

response, Mr. Nelton obtained legal representation. He declined to see Dr. Cenac, and Cenac terminated his wage continuation. After obtaining counsel, Mr. Nelton and his spouse decided that Mr. Nelton should see Dr. Zoran Cupic, an orthopedic surgeon in Houston, Texas. It takes less time for Mr. Nelton to travel from his home in Oklahoma to Houston, Texas than to Houma, Louisiana, where Dr. Cenac maintains his practice.

33.     Mr. Nelton had an examination with Dr. Cupic on April 7, 2010. Dr. Cupic found tenderness in the neck, some spasms, and a reduced range of motion. At trial, Dr. Cupic testified that he had also reviewed the medical records of Mr. Nelton and the MRIs. Based on the material, Dr. Cupic expressed the opinion that the disc herniation at C6-C7 was caused by the March 22, 2009 work incident and not by either the car accident on April 26, 2008 or the car accident on September 29, 2009.

34.     Mr. Nelton also had an examination with Dr. Angel Roman on June 24, 2010. Dr. Roman is a medical doctor who specializes in the field of physical medicine and rehabilitation, which addresses work-related injuries to the neck, back, or joints and injuries and diseases that otherwise cause an individual to be incapacitated or cause chronic pain. At trial, Dr. Roman also testified that based on his review of Mr. Nelton's medical records and the MRIs, he is of the opinion that Mr. Nelton's disc herniation at C6-C7 was caused by the March 22, 2009 work incident and not by either of the car accidents.

35.     There are various documents prepared after the incident in which Mr. Nelton is said or is implied to have reported that his injury is not job-related. With respect to some of these documents, however, the credible evidence is that Mr. Nelton did not make such statements. In an incident report form dated March 29, 2009, Mr. Romero indicated that

Mr. Nelton had told him that the injury was not job-related. In addition, in an email dated April 15, 2009 written by Mr. Tommy Falgout, who was Cenac's personnel manager at the time, Mr. Falgout stated that Mr. Nelton had told him that "he didn't think [the injury] happened on the boat." At trial, however, Mr. Nelton testified that he did not tell either Mr. Romero or Mr. Falgout that his neck condition was not job-related. Mr. Falgout also testified that he wrote the aforementioned email after speaking with only Mr. Romero. The credible evidence, thus, is that Mr. Nelton did not tell either Mr. Romero or Mr. Falgout that his neck injury was not job-related.

36.   Little weight is to be given to the remaining documents in which Mr. Nelton is said to have reported that his injury is not job-related, all of which were completed before Mr. Nelton spoke to Dr. Nees. On the Patient Information Form completed when Mr. Nelton visited Vantage Open MRI on April 10, 2009, Mr. Nelton circled "no" in response to the question "is this exam due to an accident." That question was under the heading "Insurance Information." Similarly, on the Patient Information Form completed when Mr. Nelton visited the office of Dr. Nees on April 17, 2009, Joanna West, the receptionist at the office of Dr. Nees, checked the box "no" in response to the question "are you claiming this as an on-the-job injury." That question appears under the heading "Health Insurance Information." Both of these answers reflect the fact that as Mrs. Nelton stated in her testimony, Cenac had expressed concerns about the medical costs incurred by its employees. At the time, Mr. and Mrs. Nelton thought that it would be best to make a claim against their own insurance policy and thus not indicate, in the context of insurance-related questions, that the injury was job-related.

37.     At the April 10, 2009 visit to Vantage Open MRI, a Clinical Information Form was also filled out. On that form, Ms. Tiffany Whitaker, an MRI technician at Vantage Open MRI, wrote that the symptoms of pain the neck and left shoulder and numbness in the left fingers began 8-10 months prior to that date. Similarly, on the Patient Information Form from Mr. Nelton's visit to the office of Dr. Nees on April 17, 2009, Ms. West, the receptionist, indicated that the injury was caused by a car accident the preceding year. On the separate Patient History Form also from the April 17, 2009 visit to Dr. Nees's office, Ms. West wrote that Mr. Nelton is "not sure at this time if his injury is related to work" and that he "[t]hinks it could be related to an old MVA injury."

38.     With respect to these statements, none of which were written by Mr. Nelton himself, the credible evidence is that Mr. Nelton disclosed to Ms. Whitaker and Ms. West that he had a car accident on April 26, 2008. The credible evidence also indicates that Ms. Whitaker and Ms. West may have misinterpreted Mr. Nelton's comment to mean that his symptoms had begun earlier than March 22, 2009. Alternatively, to the extent that Mr. Nelton expressed his thought that his neck condition could be related to the April 26, 2008 car accident, those are merely the speculations made by a lay man with no medical expertise.[3] As noted above, in light of Mr. Nelton's history, physical examinations, and objective imaging studies, no medical doctor has concluded that the March 22, 2009

---

[3] On an onboard investigation accident report dated April 13, 2009, Mr. Cliff Fenton, who worked at Cenac, wrote that when Mr. Nelton spoke to him, Mr. Nelton attributed his injury to age. Again, this conversation occurred before Mr. Nelton had the opportunity to see Dr. Nees, and, to the extent that Mr. Nelton did make such a statement to Mr. Fenton, it reflects the speculation of a lay man about the cause of his injury. At trial, Mr. Nelton could not recall whether he had such a conversation with Mr. Fenton.

incident played no role in causing Mr. Nelton's disc herniation at C6-C7.

39.     Following the initial evaluation on April 7, 2010, Mr. Nelton had follow-up visits with Dr. Cupic on May 19, 2010 and on June 23, 2010. At a third follow-up visit on August 23, 2010, Dr. Cupic recommended that Mr. Nelton undergo a surgical procedure called anterior cervical diskectomy and fusion with instrumentation. The purpose of the procedure is to eliminate pain and to increase functioning. The credible evidence is that the surgery and the related medical services were reasonable and medically necessary. At trial, Dr. Cupic testified as such. In his testimony, Dr. Cenac expressed doubts about whether the surgery is the best course of treatment. But having seen Mr. Nelton only once since September 2009, he also stated that he would have to defer to the opinion of the treating physician, and he declined to state that the surgery is medically unreasonable.

40.     Mr. Nelton had the surgery on September 2, 2010. At trial, Dr. Cupic testified that during the following 12 to 18 months, Mr. Nelton cannot do any type of work. He also testified that from thereon, Mr. Nelton will be subject to a number of restrictions in terms of the physical activities that he can do. In particular, Mr. Nelton will not be able to lift anything heavier than 20 pounds, and he will not be able to walk, stand, drive, or do activities that require him to lift his arm above his head for a prolonged period of time. Although the vocational appraisals undertaken by Carl Hansen at the request of Mr. Nelton and by Nancy Favaloro at the request of Cenac suggest that Mr. Nelton could perform some light or light/medium work, such as working as a delivery driver, the testimony of Dr. Cupic casts doubt on this possibility. Neither of the reports indicates that

Mr. Nelton can ever work on a vessel again.

41.    At the request of Mr. Nelton, Dr. Kenneth McCoin has prepared an estimate of Mr.

Nelton's loss of past and future wages. He estimates that Mr. Nelton has lost $46,189 in

past wages and will lose $440,523 in future wages, for a total of $486,712. This estimate

reflects the fact that Mr. Nelton was 33 years old when he was injured and is expected to

work an additional 23.6 years during his remaining lifetime. It takes into account the fact

that Mr. Nelton earned $38,320 in 2008, the year before his injury, and assumes that Mr.

Nelton will obtain alternative employment on July 1, 2011 at $21,546 per year, which is

roughly the average earnings of individuals employed in Oklahoma in light production,

light delivery, and light counter jobs.

42.    At the request of Cenac, Dr. Kenneth Boudreaux has prepared an estimate of Mr.

Nelton's loss of past and future wages. He estimates that Mr. Nelton has lost $12,820 in

past wages and will lose $40,378 in future wages, for a total of $53,198. This estimate

reflects the fact that Mr. Nelton was 33 years old when he was injured and is expected to

work an additional 23.2 years during his remaining lifetime. It takes into account the fact

that Mr. Nelton earned $38,320 in 2008, the year before his injury, and assumes that Mr.

Nelton will obtain employment at minimum wage on an unspecified date. The estimate is

also made under the assumptions that Mr. Nelton has received $1,715 per month in long-

term disability benefits since early October 2009, will continue to receive that amount

through the remainder of his working life, and is not obligated under the policy to

reimburse any amount already paid to the insurer.

43.    The long-term disability benefits that Mr. Nelton has received are disbursed under a

policy issued by the Prudential Insurance Company of America. The policy provides that if the individual is disabled and not working, the monthly payment that Prudential is to remit is equal to the individual's "gross disability payment" minus his "deductible sources of income." The term "gross disability payment" is either two-thirds of the individual's wages with Cenac just prior to his date of disability or $7,000, whichever is less. Thus, with respect to an individual like Mr. Nelton, for whom two-thirds of his wages just prior to his disability is less than $7,000, the maximum amount of benefits that can be obtained from Prudential amounts to two-thirds of his wages.

44.     The term "deductible sources of income" includes any amount "identified as earnings replacement" that an individual receives "due to the [the] disability" as a result of "judgment, settlement, or otherwise" after subtracting attorney's fees. It also includes the "wages" portion of payments made under the doctrine of maintenance and cure and any workers' compensation and unemployment benefits. If an individual is disabled and working, Prudential takes into account not only the "deductible sources of income," but also the amount the individual receives as wages in order to calculate the amount of benefit to be paid out. The policy has a clawback provision: "Prudential has the right to recover any overpayments" of benefits from the recipient due to the "receipt of deductible sources of income" up to the entire amount that Prudential has remitted. A recipient of the benefits "must reimburse [Prudential] in full."

45.     Other features of the policy include the following. First, the long-term disability benefits policy is funded with contributions from Cenac only. Second, the benefits are disbursed without regard to whether the disability stems from a work-related or non-work-related

incident. Third, eligibility for the benefits appears to depend on the length of the

employee's service: an employee becomes eligible "the day after [he] complete[s] [his]

employment waiting period," a term defined as a continuous period of time during which

an employee is working as a covered employee of the employer. The plan provides that

Prudential and Cenac are to agree to the length of that period. The amount of the benefits

depends on the length of employee service only insofar as an individual's wages

increases with the time that he works for Cenac. Fourth, there is no evidence that the

policy was enacted as a result of a collective bargaining agreement or other employer-

employee negotiations. Fifth, there is no provision in the plan providing that the benefits

are to help satisfy a judgment entered against Cenac. Nor is there a provision that

authorizes Cenac to suspend payment of the long-term disability benefits once an adverse

judgment for lost wages is entered against Cenac until the long-term disability benefit

payments equal the total amount due under the judgment. At trial, Mr. Soudelier testified

that the plan is intended to provide a fringe benefit.[4]

---

[4] In its post-trial memorandum, Cenac seeks to inject significance into the fact that Mr. Soudelier was not involved in the decision to provide the benefits, and it argues that no weight should be given to Mr. Soudelier's testimony that the disability benefits are fringe benefits. The Court assumes, however, that Cenac has complied with Rule 30(b)(6) of Civil Procedure, under which it has "[t]he duty to present and prepare a [corporate representative]" to testify "beyond matters personally known to that [representative] or to matters in which that [representative] was personally involved." *Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 433 (5th Cir. 2006) (quoting *United States v. Taylor*, 166 F.R.D. 356, 361 (M.D.N.C. 1996)). By designating Mr. Soudelier as its representative, Cenac "represents that [Mr. Soudelier] has the authority to speak on behalf of the corporation." *Id.* Accordingly, the Court declines to accept Cenac's attempt to discredit the testimony of its designated representative on the ground that he was not personally involved in the decisionmaking process. At trial, Mr. Soudelier was comfortable stating several times that the disability benefits are fringe benefits, and the Court finds that this testimony is credible.

46.     The policy's provisions show that Dr. Boudreaux likely has substantially underestimated Mr. Nelton's lost wages. Dr. Boudreaux has assumed that Mr. Nelton will continue to receive disability benefits of $1,715 per month through the remainder of his working life. This figure, however, is the amount that Prudential has been paying Mr. Nelton in light of the fact that he has not returned to employment. As noted above, the policy provides that if an individual is disabled and working, the amount that he earns via that employment is taken into account in calculating the amount that Prudential is to remit. As a result, Dr. Boudreaux has erroneously assumed that the disability benefits that Mr. Nelton receives does not depend on whether he is able to find work. If one were to assume that Mr. Nelton will return to employment, the disability benefits that he receives is likely to be lower than $1,715.[5]

47.     Moreover, Dr. Boudreaux has assumed that a judgment awarding Mr. Nelton damages for the loss of past and future wages will affect neither the amount of disability benefits that Mr. Nelton has received and can retain nor the amount that he will receive in the future. As noted above, however, the policy considers such a judgment to be a "deductible source of income" regardless of whether the recipient is working.[6] Moreover, the policy

---

[5] Thus, for instance, if one were to assume that Mr. Nelton obtains full-time employment at $7.25 per hour, and that his monthly earnings just prior to his disability were $3,200, Mr. Nelton may be receiving only about $1,040 per month in disability benefits, not $1,715. By this measure, Dr. Boudreaux may have underestimated Mr. Nelton's loss of future wages by roughly $186,300.

[6] The plan provides that if a recipient obtains a lump-sum source of deductible income, such as a judgment for lost wages, the lump-sum "will be pro-rated on a monthly basis over the time period for which the sum is given" and then be deducted as a source of deductible income in calculating the monthly payment Prudential is to remit.

has a clawback provision under which Prudential has the right to seek reimbursement

from the recipient of the benefit for any amount that it has overpaid, for instance, because

of a subsequent judgment awarding the loss of past wages. In estimating the past wages

lost, Dr. Boudreaux has thus erroneously assumed that if Mr. Nelton receives a judgment

in this case awarding him past wages, he will be able to keep all of the disability benefits

that he has received. And in estimating the future wages lost, he has also erroneously

assumed that under the plan itself, a judgment awarding Mr. Nelton future wages would

not decrease the amount of disability benefits that would be paid to Mr. Nelton.

48.    Cenac has paid $6,244 in cure payments for healthcare services rendered between April

1, 2009 and September 21, 2009. Cenac has not paid for any healthcare services since

September 21, 2009 – in other words, since Mr. Nelton was in the second car accident. At

trial, Dr. Cenac testified that he does not recall having a conversation with Cenac anytime

in between September 21, 2009 and August 24, 2010 regarding the medical condition of

Mr. Nelton. Mr. Soudelier, the corporate representative of Cenac, conceded that Cenac

had not obtained the opinion of a medical doctor that Mr. Nelton had reached maximum

cure when it decided to stop paying for Mr. Nelton's medical services.[7] The evidence

shows that Cenac decided to stop the cure payments simply because Mr. Nelton declined

to go to Houma, Louisiana, to see the physician selected by Cenac for medical care.

49.    A comparison of Cenac's cure payments ledger with the billing records of the various

---

[7] At trial, counsel for Plaintiff asked Mr. Soudelier "And no doctor's ever determined that
Mr. Nelton has reached maximum medical cure - correct?" Mr. Soudelier answered "No." In
light of the line of questioning before and after this exchange, and Mr. Soudelier's tone when he
said the word "no," the Court understands Mr. Soudelier to have expressed his agreement that no
doctor has made such a determination.

healthcare providers shows that Cenac has not paid the following charges: $2,216 for the MRIs taken on April 10, 2009 and November 4, 2009; $1,935 for the physical therapy sessions that Mr. Nelton had with Ms. Horsch in October 2009 and that Mr. Nelton decided to discontinue because he could not afford them; $333 for services rendered by Dr. Cenac; $31,467.18 for services rendered by University General Hospital in connection with the surgery; and $48,765 for services rendered by Memorial Joint and Bone Clinic, including those in connection with the surgery. The total sum of past medical expenses not paid by Cenac is $84,716.18.

50.   At the request of Mr. Nelton, Dr. Roman has prepared a life care plan for Mr. Nelton. Dr. Roman estimates that Mr. Nelton's future medical expenses over the next 20 years will amount to $235,445. A significant portion of that reflects the cost of a surgical procedure called one-level cervical laminectomy discectomy fusion and of related services and care. According to Dr. Roman, Mr. Nelton will develop adjacent-level disease within the next decade, and Mr. Nelton falls within the group of individuals who, as a result of their young age, go on to have that second procedure.

51.   At trial, Mr. John Kocke, who at the request of Cenac reviewed the life care plan prepared by Dr. Roman, testified that the only part of the plan to which he objects relates to the surgery. Mr. Kocke stated that only a treating physician could have the authority to indicate whether that surgery would be needed. There was no testimony apart from that of Dr. Roman indicating that the second surgery would be required.

52.   Mr. Nelton has received maintenance payments of $490 every two weeks, or $35 per day, since his wage continuance was terminated. Mr. Nelton, who lives with his spouse and

two of his children, pays $700 in rent per month and $700 in living expenses per month. This amounts to actual expenses of about $47 per day. There was no testimony from either Mr. Nelton or his spouse that this amount is reasonable, and there is no other evidence that suggests that it is reasonable. Based on the prevailing rate in this district, the Court finds that $35 is a reasonable rate for maintenance.[8] *See, e.g.*, *Mier v. Wood Towing, LLC*, No. 08-4299, 2010 WL 2195700, at *6 (E.D. La. 2010) (Lemmon, J.) ($40 is reasonable); *Mayne v. Omega Protein, Inc.*, No. 07-4210, 2009 WL 1159060, at *9 (E.D. La. 2009) (Fallon, J.), *aff'd in part and vacated in part on other grounds*, 370 Fed. App'x 510 (5th Cir. 2010) ($35 is reasonable); *Harrison v. Diamond Offshore Drilling, Inc.*, No. 07-417, 2008 WL 708076, at *22 (E.D. La. 2008) (Vance, J.) ($37 is reasonable); *Nichols v. Weeks Marine, Inc.*, 513 F. Supp. 2d 627, 639 (E.D. La. 2007) (Fallon, J.) ($30 is reasonable); *Atl. Sounding Co. v. Curette*, No. 05-2810, 2006 WL 1560793, at *3 (E.D. La. 2006) (Zainey, J.) ($30 is reasonable).

53.   The injury that Mr. Nelton sustained on March 22, 2009 has caused pain and suffering. This flows from the fact that Mr. Nelton has not been able to provide for his family either by finding outside employment or by performing the full range of household services that he was previously able to perform. The physical injury that Mr. Nelton sustained has also

---

[8] The Fifth Circuit has held that "a court may take judicial notice of the prevailing rate" of maintenance in the district where the seaman resides in order to determine the reasonable rate in a particular case. *Hall v. Noble Drilling (U.S.) Inc.*, 242 F.3d 582, 590 (5th Cir. 2001). Research does not reveal cases indicating the prevailing rate of maintenance in the Western District of Oklahoma, where Mr. Nelton resides. Given that maintenance is the entitlement "food and lodging of the kind and quality [the seaman] would have received . . . aboard [the] ship," *id.* at 586 (quoting *Tate v. Am. Tugs, Inc.*, 634 F.2d 869, 871 (5th Cir. 1981)), and given that Cenac is based in this district, the Court finds that the prevailing rate in this district provides an appropriate basis for determining the reasonable rate of maintenance in this case.

25

strained Mr. Nelton's relationship with his spouse and adversely affected Mr. Nelton's

family life. Mr. Nelton can no longer play with or otherwise interact with his children in

the way he was used to.

## III. CONCLUSIONS OF LAW

### A. Jurisdiction

1.     The Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1333,

which confers on the federal district courts original jurisdiction over admiralty and

maritime claims. Venue is proper because the Court has personal jurisdiction over Cenac.

*See* 28 U.S.C. § 1391(b), (c).

### B. Jones Act Negligence

2.     Under the Jones Act, an employer has the duty to "provide his seaman employees with a

reasonably safe place to work." *Simmons v. Transocean Offshore Deepwater Drilling,*

*Inc.*, 551 F. Supp. 2d 471, 475 (E.D. La. 2008) (citing *Colburn v. Bunge Towing, Inc.*,

883 F.2d 372, 374 (5th Cir. 1989)). An employer breaches that duty if it fails to exercise

ordinary prudence and is thereby negligent. *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d

331, 338, 339 (5th Cir. 1997) (en banc). In other words, an employer breaches its duty if

it disregards a danger that it "'knew or should have known.'" *Colburn*, 883 F.2d at 374

(quoting *Turner v. Inland Tugs Co.*, 689 F. Supp. 612, 619 (E.D. La. 1988)). Under the

Jones Act, the negligence of a fellow employee is imputed to the employer. *See Brister v.*

*A.W.I., Inc.*, 946 F.2d 350, 354 (5th Cir. 1991) (noting that this leads to "a broad basis for

liability"); *see also De Zon v. Am. President Lines, Ltd.*, 318 U.S. 660, 664-65 (1943).

3.     Cenac was negligent in its supervision and training of Mr. Nelton with respect to the

removal of nuts and bolts.[9] As noted above, the interlocking double-wrenching technique is an unsafe way of removing nuts and bolts, in part because of the risk of over-exertion. Cenac itself acknowledges the danger of this technique. The evidence shows, however, that Mr. Nelton was encouraged to use this technique during his on-the-job training and to consider the technique as one to which he is to resort readily if a nut is too tight. There is no evidence that Cenac taught Mr. Nelton either during his formal, pre-employment training or during his on-the-job training to use alternatives that are safer than the interlocking double-wrenching technique to remove nuts and bolts. Beyond the general directive, contained in Cenac's Responsible Carrier Program manual, that employees should not use inappropriate tools for their job, Cenac has undertaken no effort to ensure that its employees are taught to remove nuts and bolts without using the interlocking double-wrenching technique.

4.    Cenac was negligent in the instruction given by Mr. Authement to Mr. Nelton on March 22, 2009 that he help remove the nuts and bolts from the header blind while Mr. Authement was in the drip pan. The evidence shows that the job is best performed by one person standing in the drip pan because it provides the best position from which to apply force to remove the nuts and bolts. By asking Mr. Nelton to assist in the task while not making that position available to Mr. Nelton, Mr. Authement heightened the risk that Mr. Nelton would over-exert himself by using the interlocking double-wrenching technique. Mr. Authement did not exercise ordinary prudence in his instructions to Mr. Nelton, and that negligence must be imputed to Cenac.

---

[9] The parties have stipulated that Mr. Nelton is a seaman under the Jones Act.

27

5.    Apart from negligence, a plaintiff seeking relief under the Jones Act must show

causation. "A seaman is entitled to recovery under the Jones Act if his employer's

negligence is the cause, in whole or in part, of his injury." *Gautreaux*, 107 F.3d at 335.

The Fifth Circuit has observed that this is a "liberal causation requirement," *Brister*, 946

F.2d at 354, one that places a "'featherweight'" burden on the plaintiff, *Landry v. Two R.*

*Drilling Co.*, 511 F.2d 138, 142 (5th Cir. 1975) (quoting Grant Gilmore & Charles Black,

The Law of Admiralty § 6-36 (1957)). Indeed, "[i]f the defendant's negligence played

any part, however small, in producing the seaman's injury, it results in liability." *Brister*,

946 F.2d at 354; *accord Chisholm v. Sabine Towing & Transp. Co., Inc.*, 679 F.2d 60, 62

(5th Cir. 1982) ("Defendant must bear responsibility if his negligence played any part,

even the slightest, in producing the injury.").

6.    Cenac's negligence in its training of and in its instructions and orders to Mr. Nelton

played a part in producing the disc herniation at C6-C7 and the resulting radiculopathy.

As noted above, all of the medical doctors who have reviewed Mr. Nelton's medical

history, performed a physical examination of him, and assessed the available objective

imaging studies, including the April 10, 2009 MRI and the November 4, 2009 MRI, have

expressed the opinion that the disc herniation at C6-C7 and the radiculopathy is

attributable to the March 22, 2009 incident. The credible evidence shows that neither the

April 26, 2008 car accident nor the September 29, 2009 car accident caused those

conditions.

**C. Unseaworthiness**

7.    "To establish a claim of unseaworthiness, 'the injured seaman must prove that the

[vessel] owner has failed to provide a vessel . . . which is reasonably fit and safe for the purposes for which it is to be used.'" *Boudreaux v. United States*, 280 F.3d 461, 468 (5th Cir. 2002) (quoting *Jackson v. OMI Corp.*, 245 F.3d 525, 527 (5th Cir. 2001)). "A vessel's condition of unseaworthiness might arise from any number of circumstances." *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 499 (1971). For instance, a vessel may have an unfit crew. *Id.*; *accord Bonmarito v. Penrod Drilling Corp.*, 929 F.2d 186, 189-191 (5th Cir. 1991). A vessel may also be unseaworthy because of "an unsafe method of work." *Johnson v. Offshore Express, Inc.*, 845 F.2d 1347, 1354-55 (5th Cir. 1988); *accord Phillips v. W. Co. of N. Am.*, 953 F.2d 923, 928 (5th Cir. 1992) (noting that "an unsafe method of work may also render a vessel unseaworthy"). An injured seaman must show something more than an "'isolated, personal negligent act'" in order to establish that a vessel was unseaworthy, however. *Lambert v. Diamond M Drilling Co.*, 688 F.2d 1023, 1024 (5th Cir. 1982) (quoting *Usner*, 400 U.S. at 500). Consistent with that requirement is the principle that a vessel owner cannot shield itself from liability by simply pointing to the fact that a practice is widespread or accepted. *See Johnson*, 845 F.2d at 1355 ("Customary or normal industry practice alone does not establish seaworthiness.").

8.    The M/V MARIE CENAC was unseaworthy on March 22, 2009. As noted above, the interlocking double-wrenching technique is an unsafe way of removing nuts and bolts. In March 2009, Mr. Romero, Mr. Hunter, Mr. Noel, and Mr. Authement were, respectively, the captain, the relief captain, the pilot, and a tankerman of the M/V MARIE CENAC. At trial, all four testified that they consider the interlocking double wrenching technique to

be an appropriate method by which to remove nuts and bolts. In addition, Mr. Nelton was trained to resort readily to the interlocking double-wrenching technique. On March 22, 2009, Mr. Hunter, Mr. Noel, and Mr. Authement were on the M/V MARIE CENAC along with Mr. Nelton. The crew of the vessel was thus trained to use an unsafe method of work; this rendered the M/V MARIE CENAC unsafe for the purpose it was intended. The mere fact that the technique was accepted as a practice on the M/V MARIE CENAC or on other Cenac vessels does not establish the seaworthiness of the vessel.

9.      A plaintiff raising a claim of unseaworthiness "must establish a causal connection between his injury and the breach of duty that rendered the vessel unseaworthy." *Jackson*, 245 F.3d at 527. "There is a more demanding standard of causation in an unseaworthiness claim than in a Jones Act negligence claim." *Johnson*, 845 F.2d at 1354. "[The] plaintiff must prove that the unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness." *Id.*

10.     The use of the interlocking double-wrenching technique played a substantial part in bringing about the disc herniation and the resulting radiculopathy. As noted above, all of the medical doctors who have reviewed Mr. Nelton's medical history, performed a physical examination of him, and assessed the available objective imaging studies, including the April 10, 2009 MRI and the November 4, 2009 MRI, have expressed the opinion that the disc herniation at C6-C7 and the radiculopathy is attributable to the March 22, 2009 incident. The credible evidence shows that neither the April 26, 2008 car accident nor the September 29, 2009 car accident caused those conditions. The disc

herniation and the radiculopathy were thus the "direct result" of the use of the double-wrenching technique onboard the M/V MARIE CENAC. *Id.*

### D. Contributory Negligence and the Primary Duty Rule

11.     Like an employer, a seaman is "obligated under the Jones Act to act with ordinary prudence under the circumstances." *Gautreaux*, 107 F.3d at 339. A seaman's "contributory negligence does not bar recovery" under the Act. *Gavagan v. United States*, 955 F.2d 1016, 1019 (5th Cir. 1992). Instead, it is "an affirmative defense that diminishes recovery in proportion to the seaman's fault." *Johnson v. Cenac Towing, Inc.*, 544 F.3d 296, 302 (5th Cir. 2008). Similarly, a seaman's contributory negligence does not preclude recovery under a claim of unseaworthiness, but rather bars recovery "for the damages sustained as a result of his own fault." *Miles v. Melrose*, 882 F.2d 976, 984 (5th Cir. 1989), *aff'd*, 498 U.S. 19 (1990); *see also Comeaux v. T.L. James & Co., Inc.*, 666 F.2d 294, 299 (5th Cir. 1982).

12.     In this case, Mr. Nelton was contributorily negligent. In light of his experience working not only as a deckhand, but also as a tankerman, Mr. Nelton knew or should have known that he could have retrieved liquid wrench to remove the nuts and bolts. Mr. Nelton also knew or should have known that he should have waited for Mr. Authement to step outside of the drip pan in order to remove the nuts and bolts from the header blind at issue. An ordinarily prudent seaman in Mr. Nelton's position would at least have informed Mr. Authement that it would be better for him to remove the nuts and bolts from inside the drip pan. *See Savoie v. Otto Candies, Inc.*, 692 F.2d 363, 372 (5th Cir. 1982) (noting that "where a seaman has the possibility of securing relief from unsafe

conditions by informing his superiors of them, but continues to work doing so, he may be found to be contributorily negligent").[10] The Court concludes that Mr. Nelton is 30% at fault for his injury.

13.     Cenac urges that the primary duty rule completely bars Mr. Nelton from recovery with respect to his Jones Act and unseaworthiness claims, but this argument is unpersuasive. The primary duty doctrine was articulated by the Second Circuit in *Walker v. Lykes Bros. S.S. Co.*, 193 F.2d 772, 773 (2d Cir. 1952). There, the court held that if an employee breaches a duty that he owes to his employer and thereby injures himself, he is absolutely barred from seeking recovery from his employer. *See id.* The court distinguished between the duty of an employee to exercise ordinary prudence – which is imposed by the law – and the duty of an employee that is "consciously assumed as a term of his employment." *Id.* The First Circuit subsequently adopted this rule in *Peymann v. Perini Corp.*, 507 F.2d 1318 (1st Cir. 1974), in the context of an unseaworthiness claim, *see id.* at 1322-23.

14.     Commentators have widely noted that the *Walker* rule is inconsistent with "the abolition of assumption of risk and the application of comparative negligence in Jones Act and unseaworthiness cases." 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 6-24 (4th ed. 2004); *see also, e.g.*, Note, *Use of "Primary Duty" Doctrine to Frustrate Comparative Negligence for Railway Workers and Seamen*, 62 Yale L.J. 111 (1952).

---

[10] The Fifth Circuit has held that "contributory negligence may [also] be found where a seaman has concealed material information about a pre-existing injury or physical condition . . . and then suffers re-injury or aggravation injury." *Johnson*, 544 F.3d at 303-04. The Court declines to find Mr. Nelton to be contributorily negligent on this ground. As noted above, the evidence shows that Mr. Nelton did not re-injure his back or aggravate a back injury on March 22, 2009, and the April 26, 2008 car accident did not otherwise predispose him to a neck injury.

Thus, while several courts of appeals have acknowledged the doctrine, *see, e.g.*,

*Churchwell v. Bluegrass Marine, Inc.*, 444 F.3d 898, 909 (6th Cir. 2006); *Ribitzki v.*

*Canmar Reading & Bates, LP*, 111 F.3d 658, 665-66 (9th Cir. 1997); *Villers Seafood Co.,*

*Inc. v. Vest*, 813 F.2d 339, 342-43 (11th Cir. 1987), they have significantly narrowed its

scope, *see* Schoenbaum, *supra*, § 6-24 (noting that "the courts began to retrench" after

*Walker*); *see also, e.g., Bernard v. Maersk Lines, Ltd.*, 22 F.3d 903, 907 (9th Cir. 1994)

(announcing several "limiting principles" to the rule); *Kelley v. Sun Transp. Co.*, 900

F.2d 1027, 1031 (7th Cir. 1990) (approving of the modern form of the rule).

15.    The modern form of the primary duty rule provides that "a ship's officer may not recover

against his employer for negligence or unseaworthiness when there is *no other cause* of

the officer's injuries other than the officer's breach of his consciously assumed duty to

maintain safe conditions aboard the vessel." *Wilson v. Maritime Overseas Corp.*, 150

F.3d 1, 11 (1st Cir. 1998) (emphasis added). In other words, the now-refashioned primary

duty rule yields an absolute bar to recovery only if there is "a finding of no negligence

[on the part] of the employer." *Kelley*, 900 F.2d at 1031; *accord Churchwell*, 444 F.3d at

909; *Wilson*, 150 F.3d at 11.

16.    The Fifth Circuit has aligned itself with these decisions, indicating that the primary duty

rule should be limited in this fashion. *See Gautreaux v. Scurlock Marine, Inc.*, 84 F.3d

776, 782 (5th Cir. 1996), *reinstated in relevant part*, 107 F.3d 331, 339 (5th Cir. 1997)

(en banc) ("Our jurisprudence may lend some support to [the notion] that [an employee]

should be barred from recovery if his negligent conduct alone caused his injury, and *his*

*employer was completely free from fault*." (emphasis added)); *Kendrick v. Ill. Cent. Gulf*

*R.R. Co.*, 669 F.2d 341, 344 (5th Cir. 1982). In this case, then, Cenac's argument that the primary duty rule shields it from liability is unavailing because Cenac is, in part, at fault for Mr. Nelton's injury. Accordingly, the primary duty rule does not operate to bar Mr. Nelton from any recovery.

**E. The Collateral Source Rule and Damages for Jones Act Negligence and Unseaworthiness**

17.  "The collateral source rule is a substantive rule of law that bars a tortfeasor from reducing the quantum of damages owed to a plaintiff by the amount of recovery the plaintiff receives from other sources of compensation that are independent of (or collateral to) the tortfeasor." *Davis v. Odeco, Inc.*, 18 F.3d 1237, 1243 (5th Cir. 1994). The basic purpose of this rule is to ensure that "the tortfeasor pays for his faulty conduct" and that it does not take advantage of or profit from streams of income that are otherwise available to a tort victim. *Phillips*, 953 F.2d at 931; *accord Haughton v. Blackships, Inc.*, 462 F.2d 788, 791 (5th Cir. 1972).

18.  To determine whether benefits are subject to the collateral source rule, a court must ascertain whether the benefits are "intended to respond to potential future legal liability." *Phillips*, 953 F.2d at 932; *accord Johnson*, 544 F.3d at 305 (noting that "the ultimate inquiry remains whether the tortfeasor established the plan as a prophylactic measure against liability" (quoting *Davis*, 18 F.3d at 1245)). If the benefits are intended to indemnify an employer against legal liability, then the benefits can be used to reduce the damages owed by the employer. *Phillips*, 953 F.2d at 930-33. If, however, the benefits are merely fringe benefits, then the benefits cannot be used to reduce the damages. *Id.* Underlying this focus on indemnification is the idea that a tortfeasor who has taken the

precaution to indemnify itself against liability should not have to pay twice for the injury – in other words, a tort victim should not be allowed to obtain "double recovery." *Haughton*, 462 F.2d at 791.

19.   Citing with approval the decision in *Allen v. Exxon Shipping Co.*, 639 F. Supp. 1545 (D. Me. 1986), the Fifth Circuit in *Phillips* identified five factors that "may assist" in determining whether a disability benefit is a collateral source benefit. *Phillips*, 953 F.2d at 932. These are "(1) whether the employee makes any contribution to funding of the disability payment; (2) whether the benefit plan arises as the result of a collective bargaining agreement; (3) whether the plan and payments thereunder cover both work-related and non-work-related injuries; (4) whether payments from the plan are contingent upon length of service of the employee; and (5) whether the plan contains any specific language contemplating a set-off of benefits received under the plan against a judgment received in a tort action." *Id.* (citing *Allen*, 639 F. Supp. at 1548).

20.   The Fifth Circuit has cautioned that these are only "some" of the factors that underlie the inquiry, *Johnson*, 544 F.3d at 305, and that they "must not . . . be applied woodenly," *Davis*, 18 F.3d at 1244; *see also Phillips*, 953 F.2d at 931 (noting that the inquiry "frequently is more subtle" than looking into whether the employer paid for the benefit). The court must undertake an overall examination of "the character of the benefits received, as well as the source of those benefits." *Davis*, 18 F.3d at 1244. And as noted above, the ultimate question is whether the benefits "reflect[] a tortfeasor's effort to anticipate potential legal liability" or, instead, constitute "additional consideration for employment." *Id.*

21.     Having closely examined the plan that is at issue, the Court concludes that the disability benefits arise from a collateral source. To be sure, two of the *Phillips* factors weigh in favor of finding that the disability benefits are not collateral: the plan is funded by Cenac, and there is no evidence that the plan arose as a result of a collective bargaining agreement or other form of employer-employee negotiation. But the remaining factors suggest that Cenac did not adopt the policy to indemnify itself against liability and that the disability benefits are simply additional benefits of employment with Cenac. The plan provides benefits regardless of whether the disability stem from a work-related or non-work-related injury. In addition, it appears that eligibility for benefits depends in part on whether the employee has worked through a specified time period with Cenac. More importantly, and in contrast to cases where benefits were found not to be collateral, there is no provision in the plan in this case providing that the benefits will help satisfy a judgment entered against Cenac. *See Burlington N. R.R. Co. v. Strong*, 907 F.2d 707, 714 (7th Cir. 1990); *Folkestad v. Burlington N., Inc.*, 813 F.2d 1377, 1379 & n.2 (9th Cir. 1987); *Kan. City S. Ry. Co. v. Nussbeck*, 135 S.W.3d 874, 876 n.7 (Tex. App. 2004).[11] Nor is there a provision, as in *Allen*, that authorizes Cenac to suspend payment of the long-term disability benefits once an adverse judgment is entered against Cenac until the long-term disability benefit payments equal the total amount due under the judgment. *See*

---

[11] In *Johnson*, the Fifth Circuit made explicit what had remained implicit in its jurisprudence – that cases involving railroad employers under the Federal Employers' Liability Act (FELA), including those that relate to the collateral source rule, are instructive in the context of Jones Act cases because the Jones Act incorporates by reference FELA. *See Johnson*, 544 F.3d at 304 n.5; *see also Phillips*, 953 F.2d at 929-34 (citing FELA cases to delineate the contours of the collateral source rule in a Jones Act case).

*Allen*, 639 F. Supp. at 1548. Both types of provisions, had they existed, would clearly demonstrate that "the dominant purpose of the plan is to provide a source of indemnification of the employer against liability . . . arising from personal injury." *Id.* at 1549; *see also Folkestad*, 813 F.2d at 1383. Their absence – noted by both Mr. Nelton and Cenac in their post-trial memoranda – thus makes it difficult to conclude that the plan is intended to help indemnify Cenac. The policy is devised in such a way that if a judgment is entered against Cenac, it is the insurer that stands to reduce its obligations, and not Cenac. On balance, then, the *Phillips* factors weigh heavily in favor of finding that the plan provides an additional benefit of employment with Cenac, and not a form of indemnification.

22.     Finally, the Court notes that the *Phillips* factors do not delimit the inquiry. As indicated above, a central purpose of the collateral source rule is to ensure that the tort victim does not receive a windfall by obtaining double recovery. The conclusion, in this case, that the long-term disability benefits are collateral will not lead Mr. Nelton to obtain double recovery.[12] As noted above, under the plan's formula and clawback provision, any amount that is awarded in the judgment in this case will be used to reduce, and perhaps eliminate, any past payments that Mr. Nelton can retain. In addition, the plan's terms also

---

[12] Courts applying the collateral source rule have sometimes said that in such cases, "[t]he question [is] not whether a windfall is to be conferred, but rather who shall receive the benefit of a windfall which already exists." *E.g.*, *Gypsum Carrier, Inc. v. Handelsman*, 307 F.2d 525, 534 (9th Cir. 1962). These courts have observed that, "[a]s between the injured person and the tortfeasor, the former's claim is the better." *Id.* These statements may very well be on point where the amount disbursed by the collateral source does not depend on any judgment entered. In this case, however, the policy provides otherwise, and it is clear that there will be no windfall for Mr. Nelton.

indicate that Mr. Nelton will receive substantially lower payments as a result of the

judgment in this case. There will, in other words, be no double recovery. In these

circumstances, Cenac "cannot expect [Mr. Nelton] to accept benefits . . . reduced to

reflect a Jones Act award and have that award reduced by the amount of benefits that

would have been paid." *Ruberto v. Maritrans Operating Partners, LP*, No. 91-7654,

1993 WL 316754, at *2 (E.D. Pa. 1993). In light of the above, and in light of Mr.

Soudelier's own testimony that the disability payments are fringe benefits, the Court

concludes that the disability benefits cannot be used to reduce the damages to be awarded

in this case.

23.     Under the Jones Act and general maritime law, an injured seaman is entitled to monetary

recovery for past, present, and future loss of earning capacity and wages, medical

expenses, and pain and suffering resulting from injury caused by the employer's

negligence and the unseaworthiness of the vessel. Schoenbaum, *supra*, §§ 5-15, 6-18; *see

also Sosa v. M/V Lagbo Izabal*, 736 F.2d 1028, 1034-35 (5th Cir. 1984). In light of the

credible evidence, Mr. Nelton has sustained the following damages:

|   |   |
|---|---|
| a. Past wages: | $46,189.00 |
| b. Future wages: | $440,000.00 |
| c. Past medical expenses: | $84,716.18 |
| d. Future medical expenses: | $75,000.00 |
| e. Past pain and suffering: | $75,000.00 |
| f. Future pain and suffering: | $100,000.00 |

24.     In light of Mr. Nelton's contributory negligence, he may recover the following amounts:

a. Past wages:     $32,332.30

b. Future wages:    $308,000.00

c. Past medical expenses: $59,301.33

d. Future medical expenses: $52,500.00

e. Past pain and suffering: $52,500.00

f. Future pain and suffering: $70,000.00

## F. Maintenance and Cure

*Whether Mr. Nelton is entitled to maintenance and cure*

25. "Maintenance and cure is an obligation imposed upon a shipowner to provide for a seaman who becomes ill or injured during his service to the ship." *Boudreaux*, 280 F.3d at 468. This obligation "does not depend on any determination of fault, but rather is treated as an implied term of any contract for maritime employment." *Jauch v. Nautical Servs., Inc.*, 470 F.3d 207, 212 (5th Cir. 2006). "[A]mbiguities or doubts in the application of the law of maintenance and cure are resolved in favor of the seamen." *Gaspard v. Taylor Diving & Salvage Co.*, 649 F.2d 372, 374 n.2 (5th Cir. 1981). As noted above, the parties have stipulated that Mr. Nelton is a seaman, and the evidence shows that he was injured on March 22, 2009 while working onboard the M/V MARIE CENAC. Accordingly, Mr. Nelton is entitled to maintenance and cure.

26. A seaman may forfeit his right to maintenance and cure if he "simply reject[s] all timely medical attention or quit[s] participation in a course of therapy already begun."*Oswalt v. Williamson Towing Co., Inc.*, 488 F.2d 51, 53-54 (5th Cir. 1974). But if the employer "tenders to a seaman . . . care from a particular private physician, . . . the seaman does not

breach his obligation merely by choosing to see a different private doctor." *Caulfield v. AC & D Marine, Inc.*, 633 F.2d 1129, 1134 (5th Cir. 1981). In this case, Mr. Nelton's declined to see Dr. Cenac, the physician selected by Cenac. But he did so because he sought medical care closer to home in Oklahoma and Texas, and he was later on able to obtain that care. Accordingly, Mr. Nelton has not forfeited his right to maintenance and cure. Separately, Mr. Nelton declined to continue his second course of physical therapy with Ms. Horsch, which took place in October 2009 after the September 29, 2009 car accident. But he undertook that course of therapy at the recommendation of Dr. Dycus, his family doctor, and not Dr. Cenac. Moreover, Cenac did not pay for that course of therapy. In light of this, it cannot be said that the physical therapy constituted care tendered by Cenac, and Mr. Nelton's decision to forego that course of physical therapy because he could not afford it cannot be viewed as having caused him to forfeit his right to maintenance and cure.

27.   If an employer requires "the seaman to submit to medical examination as part of its hiring process, a seaman who misrepresents or conceals any material medical facts [also] risks forfeiture of his maintenance and cure benefits." *Jauch*, 470 F.3d at 212 (citing *McCorpen*, 396 F.2d at 549). To establish this defense, an employer must show three elements: "(1) the claimant intentionally misrepresented or concealed medical facts; (2) the non-disclosed facts were material to the employer's decision to hire the claimant; and (3) a connection exists between the withheld information and the injury complained of in the lawsuit." *Id.* (citing *Brown v. Parker Drilling Offshore Corp.*, 410 F.3d 166, 171 (5th Cir. 2005)).

28.     Cenac urges that this defense applies to the physical examination that Mr. Nelton
        underwent on May 27, 2008. But this argument must be rejected. The Fifth Circuit,
        starting with *McCorpen* itself, has indicated that the defense applies only to pre-
        employment physical examinations. *See, e.g.*, *id.* (noting that the concealment must have
        occurred "at the time [the seaman] was employed"); *McCorpen*, 396 F.2d at 549
        (focusing on the significance of a "pre-hiring medical examination or interview"). The
        May 27, 2008 examination was an annual physical that was performed four years after
        Mr. Nelton began his employment with Cenac. Thus, the *McCorpen* defense, by its own
        terms, is not available in this case. *Accord Kuithe v. Gulf Caribe Maritime, Inc.*, No. 08-
        458, 2010 WL 3419998, at *9 (S.D. Ala. 2010) (rejecting the application of the
        *McCorpen* defense to a post-hire physical exam).

29.     Even if one were to assume that the defense applies to a post-hire examination, the
        credible evidence fails to reveal "a connection . . . between the withheld information and
        the injury complained of in [this] lawsuit." *Jauch*, 470 F.3d at 212. To the extent that Mr.
        Nelton sustained an injury on April 26, 2008, it was an injury to his lower back, not his
        neck. Moreover, there is no evidence that the April 26, 2008 car accident predisposed Mr.
        Nelton to a neck injury or that it is otherwise related to the neck injury that Mr. Nelton
        sustained on March 22, 2009. Accordingly, Cenac's argument that Mr. Nelton has
        forfeited his right to maintenance and cure because he did not mention the April 26, 2008
        car accident during the physical on May 27, 2008 fails as a matter of law. The motion for
        judgment as a matter of law that Mr. Nelton made at the end of trial with respect to this
        argument must be, and is hereby, GRANTED.

41

***Whether Cenac has satisfied its maintenance and cure obligations***

30.    With respect to maintenance, "[a] seaman is entitled to the reasonable cost of food and

lodging in his locality, provided that he actually spends that amount on his upkeep." *Hall*,

242 F.3d at 589. "A seaman's burden of production in establishing the value of

maintenance is feather light: his own testimony as to reasonable cost of room and board

in the community where he is living is sufficient to support an award." *Yelverton v.*

*Mobile Labs., Inc.*, 782 F.2d 555, 558 (5th Cir. 1986).

31.    "The duty to provide cure encompasses not only the obligation to reimburse medical

expenses actually incurred, but also to ensure that the seaman receives proper treatment

and care." *Boudreaux*, 280 F.3d at 468. If a seaman declines to see a private physician

chosen by the employer and instead seeks the care of another private physician, the

employer can reduce its cure obligations to the extent "that the cost of the plaintiff's

treatment unnecessarily exceeded that which the employer would have incurred had the

employee followed the employer's recommendation regarding a physician." *Caufield*,

633 F.2d at 1134.

32.    "The maintenance and cure duty terminates only when maximum cure has been reached,

i.e., 'where it is probable that further treatment will result in no betterment in the

claimant's condition.'" *Boudreaux*, 280 F.3d at 468 (quoting *Rashidi v. Am. President*

*Lines*, 96 F.3d 124, 128 (5th Cir. 1996)). "Thus, where it appears that the seaman's

condition is incurable, or that future treatment will merely relieve pain and suffering but

not otherwise improve the seaman's physical condition, it is proper to declare that the

point of maximum cure has been achieved." *Pelotto v. L & N Towing Co.*, 604 F.2d 396,

400 (5th Cir. 1979).

33.     As noted above, the credible evidence shows that Mr. Nelton did not reach maximum

cure on September 21, 2009. In fact, no medical doctor has testified that Mr. Nelton has

reached maximum cure. The evidence also shows that Cenac has not paid for some of the

healthcare costs incurred between April 1, 2009 and September 21, 2009 and for any of

the healthcare costs since September 21, 2009. The total sum of past medical expenses

for which Cenac has not paid is $84,716.18. The credible evidence also shows that the

surgery recommended and performed by Dr. Cupic and the related medical services were

reasonable and medically necessary. Thus, the past cure payments amount to $84,716.18,

and Cenac is obligated to pay for the reasonably necessary costs of medical care until Mr.

Nelton reaches maximum cure.[13]

34.     Nonetheless, Mr. Nelton is not entitled to recover the full amount of past and future

---

[13] It is true that "normal rules of damages, such as the collateral source rule in tort, are not strictly applied" in the context of maintenance and cure. *Gauthier v. Crosby Marine Serv., Inc.*, 752 F.2d 1085, 1089 (5th Cir. 1985). Thus, a shipowner may refer to funds received by the seaman to reduce its maintenance and cure obligations. *See Davis*, 18 F.3d at 1245-46. "Nevertheless, a shipowner is not permitted to set off all moneys an injured seaman receives." *Gauthier*, 752 F.2d at 1090. In particular, while funds received to help cover medical expenses can certainly be used to reduce the amount of cure owed by the shipowner, *see, e.g.*, *Moran Towing & Transp., Co. v. Lombas*, 58 F.3d 24, 25-27 (2d Cir. 1995); *Al-Zawkari v. Am. S.S. Co.*, 871 F.2d 585, 588-89 (6th Cir. 1989); *Gosnell v. Sea-Land Serv., Inc.*, 782 F.2d 464, 468 (4th Cir. 1986); *Shaw v. Ohio River Co.*, 526 F.2d 193, 200-02 (3d Cir. 1975), it is doubtful that funds received as wage supplements, such as the disability benefits that Mr. Nelton has received, but may not be able to retain, can be used for that same purpose. *See Shaw*, 526 F.2d at 201; *Gypsum Carrier*, 307 F.2d at 536-37; *cf. Morel v. Sabine Towing & Transp. Co., Inc.*, 669 F.2d 345, 347 (5th Cir. 1982) (noting that wages and other forms of earnings cannot be used to satisfy maintenance obligation unless expressly provided for in contract). A conclusion to the contrary would be in tension with the Supreme Court's holding in *Vaughan v. Atkinson*, 369 U.S. 527 (1962), that the wages that a seaman receives during the time he is entitled to maintenance and cure cannot be used to reduce the shipowner's obligations, *id.* at 533.

medical costs, for "a seaman clearly can receive only one recovery for his medical expenses." *Brister*, 946 F.2d at 361 (citing *Vickers v. Turney*, 290 F.2d 426, 435 (5th Cir. 1961)). Because Mr. Nelton is entitled to recover 70% of his past and future medical expenses under his Jones Act and unseaworthiness claims, the cure payments must be limited to the remaining 30% of those expenses.

35.     With respect to maintenance, the Court, as noted above, finds that $35 per day is a reasonable rate. Because Cenac has paid maintenance at the rate of $35 per day, the Court concludes that Cenac has satisfied its obligation to pay maintenance. The Court also concludes that Cenac is obligated to pay maintenance at the rate of $35 per day until Mr. Nelton reaches maximum cure. That Mr. Nelton is recovering for the loss of past and future wages does not present a problem of double recovery: "an award of maintenance by the trial court in addition to general damage award that includes past and future wages is proper" because "'[m]aintenance is neither a substitute for wages nor is it to be considered in lieu of a seaman's wages.'" *Colburn*, 883 F.2d at 378 (quoting *Morel*, 669 F.2d at 346).

### Punitive damages and attorney's fees

36.     The Supreme Court has recently held that a seaman may recover punitive damages for a defendant's "willful and wanton disregard of the maintenance and cure obligation." *Atl. Sounding Co., Inc. v. Townsend*, 129 S. Ct. 2561, 2575 (2009). Although the Fifth Circuit does not appear to have had the opportunity to consider this holding, it is clear that the Supreme Court's decision abrogates the Fifth Circuit's *en banc* determination in *Guevara v. Maritime Overseas Corp.*, 59 F.3d 1496, 1513 (5th Cir. 1995), that punitive damages

are unavailable where a seaman has shown that the employer's failure to pay

maintenance and cure is willful. *See Atl. Sounding*, 129 S. Ct. at 2575, 2566. It, in effect,

restores the previous Fifth Circuit case law under which both punitive damages and

attorney's fees are available in cases where an employer has willfully failed to pay

maintenance and cure, *see, e.g.*, *Morales v. Garijak, Inc.*, 829 F.2d 1355, 1358 (5th Cir.

1987), albeit with one modification: the Supreme Court has suggested that under general

maritime law, the amount of punitive damages should not exceed the amount of

compensatory relief awarded. *See Exxon Shipping Co. v. Baker*, 554 U.S. 471, 513-14

(2008).

37.    "[T]he willful, wanton and callous conduct required to ground an award of punitive

damages requires an element of bad faith." *Harper v. Zapata Offshore Co.*, 741 F.2d 87,

90 (5th Cir. 1984). Because the determination of whether a seaman has reached

maximum recovery is "a medical question, not a legal one," the element of bad faith can

be inferred from an employer's complete failure to consult a medical source in deciding

to terminate maintenance and cure payments. *Breese v. AWI, Inc.*, 823 F.2d 100, 104 (5th

Cir. 1987).

38.    As noted above, the credible evidence in this case shows that Cenac decided to stop the

cure payments for the sole reason that Mr. Nelton declined to go see Dr. Cenac, the

physician selected by Cenac, and sought instead to obtain medical care closer to home.

Dr. Cenac testified that in between September 21, 2009 and August 24, 2010, he did not

speak with Cenac regarding the medical condition of Mr. Nelton. Because Cenac did not

seek a medical opinion regarding Mr. Nelton's medical condition in deciding to terminate

45

the cure payments, the Court concludes that punitive damages in the amount of $5,000 and attorney's fees in the amount of $2,000 is appropriate in this case.

## G. Pre-Judgment Interest

39.     In admiralty cases, although an award of prejudgment interest is discretionary with the court, such interest is normally awarded unless specific circumstances are present that would make the award inequitable. *See Probo II London v. Isla Santay M/V*, 92 F.3d 361, 363-64 (5th Cir.1996). The rate of prejudgment interest, as well as the date from which it accrues, is also discretionary with the court. *See Marathon Pipe Line Co., v. M/V Sea Level II*, 806 F.2d 585, 593 (5th Cir. 1986). "The essential rationale for awarding prejudgment interest is to ensure that an injured party is fully compensated for its loss." *City of Milwaukee v. Cement Div., Nat'l Gypsum Co.*, 515 U.S. 189, 195 (1995). "[P]rejudgment interest is not awarded as a penalty; it is merely an element of just compensation." *Id.* at 197. Prejudgment interest is appropriate in cases of mutual fault. *Id.* at 199. Given the facts of the instant case, the Court finds that an award of prejudgment interest on all past damages at the rate of 0.29 percent per annum from the date of judicial demand is appropriate.

## IV. SUMMARY

On the basis of the above Findings of Fact and Conclusions of Law, the Court finds that Mr. Nelton has sustained damages due to Cenac's negligence and the unseaworthiness of the M/V MARIE CENAC. The Court also finds that Mr. Nelton is entitled to payment for maintenance and cure and to punitive damages and attorney's fees for the willful denial of cure payments. Accordingly, Mr. Nelton is entitled to recover the following from Cenac:

a. Past wages:                     $32,332.30

b. Future wages:                   $308,000.00

c. Past medical expenses:          $84,716.18

d. Future medical expenses:        $75,000.00

e. Past pain and suffering:        $52,500.00

f. Future pain and suffering:      $70,000.00

g. Maintenance: $35 per day until Mr. Nelton reaches maximum cure

h. Punitive damages:               $5,000.00

i. Attorney's fees:                $2,000.00

In addition, Mr. Nelton is entitled to pre-judgment interest on the above-mentioned past losses totaling $169,548.48 at the rate of 0.29 percent per annum from the date of judicial demand until satisfied. Furthermore, Mr. Nelton is entitled to post-judgment interest at the judicial rate from the date of judgment until paid on all other elements of recovery, totaling $460,000.00 plus outstanding maintenance payments.

Finally, in light of the above, the Court finds that Cenac is not entitled to recover any maintenance and cure payments. Accordingly, judgment with respect to its counterclaim is to be entered in favor of Mr. Nelton and against Cenac, and the counterclaim is to be dismissed with prejudice.

New Orleans, Louisiana, this 24th day of January, 2011.

_____
UNITED STATES DISTRICT JUDGE

47